J-A17033-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.E., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: I.E., MOTHER | : | No. 505 EDA 2023 |

Appeal from the Order Entered February 6, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-DP-0000553-2022

BEFORE:   KING, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KING, J.:                    **FILED OCTOBER 3, 2023**

Appellant, I.E. ("Mother"), appeals from the order entered in the Philadelphia County Court of Common Pleas, which dismissed the dependency petition filed by the Philadelphia County Department of Human Services ("DHS"), transferred legal and physical custody of her minor child, B.E. ("Child"), to K.K. ("Father"), and entered a finding of abuse against Mother. We affirm.

The relevant facts and procedural history of this case are as follows. Mother and Father are the natural parents of Child, who was born in December 2020.  Mother and Father are not married, and their relationship ended around the time of Child's birth.  After her birth, Child resided with Mother.

_____

[*] Retired Senior Judge assigned to the Superior Court.

On April 28, 2022, DHS received a Child Protective Services ("CPS") report alleging that Mother had taken Child to Saint Christopher's Hospital for Children earlier that day. Mother initially decided to take Child to the hospital because Child's "asthma was flaring up[.]" (Dependency Petition, filed 6/10/22, at ¶b). On the way to the hospital, however, Mother claimed that a car struck Child's stroller. The collision allegedly "tipped forward" the stroller, causing Child to hit her head on the ground. (*Id.*) Mother and Child arrived at the hospital shortly thereafter. While in the waiting room of the hospital's emergency department, Child "had pauses in her breathing and was in an altered mental state." (*Id.*) Based on these symptoms, the doctor suspected that Child had ingested an opiate. The doctor administered a dose of Naloxone, and Child "became alert and returned to her normal behavior[.]" (*Id.*) Child subsequently tested positive for fentanyl. (*See id.* at ¶e).

Mother denied having any legal or illegal drugs in her home. When asked to explain how Child might have come into contact with an opiate, Mother "stated that a bystander's purse fell and the contents of the purse spilled out when the car struck [Child's] stroller; and [Mother] implied that the contents of the purse had caused [Child's] altered state." (*Id.* at ¶b). DHS interviewed Mother on April 29, 2022. During the interview, Mother "repeated the timeline of events" leading up to Child's hospitalization. (*Id.* at ¶e). Mother added that she and Child took a bus for part of their trip to the hospital. "[W]hile they were exiting the bus, a car drove around and hit [Mother] and

- 2 -

[Child]." (*Id.*) Mother reiterated "that a bystander helped them and that something in the bystander's purse may have exposed [Child] to fentanyl." (*Id.*)

At the conclusion of its investigation, DHS "indicated" the CPS report, and it "upgraded [the report] to reflect that the incident was a near fatality." (*Id.* at ¶b). DHS contacted Mother's great-aunt, who agreed to serve as a placement resource for Child. Mother and her great-aunt signed a safety plan, and Child was discharged from the hospital to Mother's great-aunt. Around this time, Mother's great-aunt presented Father to DHS and the Community Umbrella Agency ("CUA") as a potential placement resource.[1]

On June 10, 2022, DHS filed a petition alleging that Child was a dependent child under the Juvenile Act,[2] and she was a victim of child abuse under the Child Protective Services Law ("CPSL").[3] The court conducted an adjudicatory hearing on February 6, 2023. At the hearing, DHS provided testimony from Child's treating physician, the DHS social worker who investigated the incident, and the CUA case manager. Mother did not testify

---

[1] In June and July of 2022, Father and Child underwent genetic testing, which confirmed Father's paternity. Following the genetic testing, a CUA case worker met with Father, assessed his home, and deemed it appropriate for Child. (*See* N.T. Hearing, 2/6/23, at 78-79). Child has resided with Father since October 2022. (*Id.* at 86).

[2] 42 Pa.C.S.A. § 6302.

[3] 23 Pa.C.S.A. §§ 6301-6387.

or present any witnesses.

At the conclusion of the hearing, the court found that DHS provided clear and convincing evidence to warrant an adjudication of Child's dependency as to Mother. The court also entered a finding of child abuse against Mother. Nevertheless, the court found that Father was "ready, willing and able" to care for Child. (N.T. Hearing at 101). Thus, the court dismissed the dependency petition, transferred legal and physical custody of Child to Father, and permitted Mother to have supervised visitation. On February 28, 2023, Mother timely filed a notice of appeal and concise statement of errors.

Mother now raises four issues for our review:

> Did the trial court err as a matter of law and abuse its discretion by finding Mother to be a perpetrator of child abuse in the absence of clear and convincing evidence that Mother recklessly caused bodily injury to [Child] by recent act or failure to act?
>
> Did the trial court err as a matter of law and abuse its discretion by finding Mother to be a perpetrator of child abuse in the absence of clear and convincing evidence that Mother recklessly perpetrated serious physical neglect of [Child] through a repeated, prolonged, or egregious failure to supervise?
>
> Did the trial court err as a matter of law and abuse its discretion by finding Mother to be a perpetrator of child abuse pursuant to 23 Pa.C.S. § 6381(d) in the absence of clear and convincing evidence that [Child] was the victim of child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent?
>
> Did the trial court err as a matter of law and abuse its discretion by awarding sole legal and physical custody of [Child] to Father in the absence of clear and convincing

evidence that [Child] would be without proper parental care and control in Mother's custody?

(Mother's Brief at 3-4).[4]

The applicable scope and standard of review for dependency cases is as follows:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re A.B.*, 63 A.3d 345, 349 (Pa.Super. 2013) (quoting *In re R.J.T.*, 608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)).

> We accord great weight to this function of the hearing judge because [the court] is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before [the court]. Relying upon [the court's] unique posture, we will not overrule [its] findings if they are supported by competent evidence.

*In re A.H.*, 763 A.2d 873, 875 (Pa.Super. 2000).

Mother's first three issues are related, and we address them together. In all three issues, Mother insists that the record did not support the court's finding of abuse. Citing Section 6303(b.1)(1) of the CPSL, Mother acknowledges that the definition of "child abuse" includes intentionally, knowingly, or recklessly "[c]ausing bodily injury to a child through any recent

---

[4] In addition to the briefs from Mother and DHS, the guardian *ad litem* filed a letter with this Court stating that she joins the brief filed by DHS. (*See* Letter, filed 6/4/23).

act or failure to act." (Mother's Brief at 15). While Mother concedes that DHS offered sufficient medical evidence to prove that Child suffered bodily injury, Mother contends that this evidence did not prove that she caused the injury through an act or omission or that she acted with the requisite intent. Mother also cites Section 6303(b.1)(7), defining child abuse as intentionally, knowingly, or recklessly "[c]ausing serious physical neglect of a child." (*Id.* at 20). Again, Mother maintains that DHS failed to demonstrate that Mother provided Child with inappropriate supervision.

Regarding Section 6381(d), Mother recognizes that this section of the CPSL provides a rebuttable presumption that a caretaker has perpetrated abuse where there is evidence that the child has suffered abuse that would ordinarily not exist except by reason of the acts or omissions of the parent. Mother argues, however, that DHS could not rely on Section 6381(d) because it "failed to present clear and convincing evidence that the injury Child suffered … is the type of injury that could not occur **except by reason** of an act or omission of a caretaker." (*Id.* at 28) (emphasis in original). Mother further argues that Section 6381(d) is a "very limited exception" to the "more stringent evidentiary standards" applicable to child abuse findings, and Section 6381(d) does not apply here because the identity of Child's caretaker is not at issue. (*Id.* at 29) (quoting *In re L.Z.*, 631 Pa. 343, 378, 111 A.3d 1164, 1184 (2015)). Mother concludes that DHS presented insufficient evidence of child abuse, and this Court must reverse the trial court's finding.

We disagree.

"Although dependency proceedings are governed by the Juvenile Act …, the [CPSL] controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence." **Interest of L.V.**, 209 A.3d 399, 417 (Pa.Super. 2019) (citation and internal quotation marks omitted). Section 6303 of the CPSL defines child abuse as "intentionally, knowingly or recklessly … [c]ausing bodily injury to a child through any recent act or failure to act." 23 Pa.C.S.A. § 6303(b.1)(1). Bodily injury is defined as "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S.A. § 6303(a).

> [T]he requisite standard of proof for a finding of child abuse pursuant to Section 6303(b.1) of the CPSL is clear and convincing evidence. **In re L.Z.**[**, supra** at 360, 111 A.3d at 1174] ("a petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations, 42 Pa.C.S.[A.] § 6341(c)"). Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." **G.V. v. Dep't of Pub. Welfare**, 625 Pa. 280, [288,] 91 A.3d 667, 672 (2014).

**In the Int. of N.B.-A.**, 657 Pa. 137, 149, 224 A.3d 661, 668 (2020).

Here, the trial court made a finding of abuse under the presumption of abuse standard as set forth in Section 6381 of the CPSL.[5] "Section 6381(d)

---

[5] The court also made findings of abuse pursuant to Section 6303(b.1)(1), (5), but we need only address the court's reasoning under Section 6381 for
*(Footnote Continued Next Page)*

of the CPSL … establishes a rebuttable, evidentiary presumption when a child sustains abuse not ordinarily suffered absent acts or omissions of a parent or other responsible party.[6]   Under such circumstances, the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible." ***Interest of C.B.***, 264 A.3d 761, 771 (Pa.Super. 2021) (*en banc*), *appeal denied*, ___ Pa. ___, 270 A.3d 1098 (2022) (internal citations and quotation marks omitted).  "*Prima facie* evidence is not the standard that establishes the child has been abused, which must be established by clear and convincing evidence; it is the standard by which the court determines whom the abuser would be in a given case." ***In Interest of J.R.W.***, 631 A.2d 1019, 1024 (Pa.Super. 1993).

> Under section 6381(d), a parent or other responsible caregiver may rebut the *prima facie* presumption with evidence:

---

purposes of this appeal.  ***See In re A.J.R.-H.***, 647 Pa. 256, 287-88, 188 A.3d 1157, 1175-76 (2018) (reiterating that appellate court can affirm trial court's decision on any basis supported by record).

[6] Section 6381 of the CPSL provides, in part:

> **(d)** *Prima facie* **evidence of abuse.**—Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S.A. § 6381(d).

> [d]emonstrating that [the parent or responsible person] did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by … [DHS] … and the rebuttal of the parent or responsible person.

*Interest of G.R.*, 282 A.3d 376, 382 (Pa.Super. 2022) (quoting *In re L.Z., supra* at 379, 111 A.3d at 1185).

Instantly, the court found that Child suffered bodily injury as required for a finding of child abuse based upon testimony from Dr. Norrell Atkinson, Child's treating physician and an expert in the field of pediatrics and child abuse. Dr. Atkinson explained that Mother originally wanted Child to see a doctor for asthma symptoms, but Child's stroller was struck by a vehicle on the way to the hospital. While in the waiting room of the hospital's emergency department, Child "started to become … less alert, was exhibiting difficulties with breathing, and wasn't acting like herself[.]" (N.T. Hearing at 11). Child's respiratory rate decreased, and "her pupils were noted to be very small in size." (*Id.*)

> When those things are seen, it raises concern for there being an opiate in the system, and so, that is typically what physicians use to then give—or administer Naloxone, or what is more widely known as Narcan.

(*Id.*)

After receiving a single dose of Naloxone, Child recovered. Subsequent

testing confirmed the presence of fentanyl in Child's system. Dr. Atkinson could not provide a precise time when Child ingested the drug: "I wouldn't say it was days, but … I don't think I can narrow it down any—anymore." (*Id.* at 18). Nevertheless, the ingestion of fentanyl created a "near fatal condition" for Child. (*Id.* at 43). Dr. Atkinson also opined that Child's symptoms were inconsistent with the accident described by Mother.[7]

In addition to the testimony from Dr. Atkinson, DHS social worker Annitra Bolger testified about her investigation into the CPS report. Ms. Bolger interviewed Mother, who provided the following account of her trip to the hospital:

> [E]n route to the doctor, they had to get off … the bus because there was … some construction and the bus was going to detour.
>
> And so, from there, unfortunately, as they were trying to cross the street, a car went around the bus and [Child's] stroller was hit and tipped over, and Mother reported that there were different people at the scene who helped her pretty much pick up her belongings.
>
> There was also possibly … a woman at the scene who was very helpful, and the contents of her purse had … spilled out while she was trying to help Mom pick [Child] up in her stroller. Once they realized that … everything appeared to be okay, they continued [on] their journey to the hospital.
>
> Mother said she walked down. She didn't get on any more buses. She walked down, pretty much pushing [Child's]

---

[7] Dr. Atkinson confirmed that Child had some "swelling to her head[.]" (N.T. Hearing at 14-15). Dr. Atkinson ordered a CT scan of Child's head, which ruled out a brain injury "that might cause [Child] to act less responsive[.]" (*Id.* at 14).

stroller, and they stopped to get something to eat and then, once they came from getting food, then they went to the appointment for [Child's] breathing.

(*Id.* at 52-53).

Ms. Bolger testified that Mother did not call the police to report that a vehicle had struck the stroller. (*See id.* at 54). Ms. Bolger inspected the stroller, but it did not appear damaged. (*Id.* at 55). When Ms. Bolger asked Mother how Child could have ingested the fentanyl, "[t]he only explanation that was given was possibly by the female bystander, who kind of … helped her … when the stroller was hit by the car." (*Id.* at 56). Ms. Bolger did not find this explanation credible:

> [I]t was just hard for me to believe that the child's stroller was hit by a car and an impact that could tip the stroller over, and there was no ambulance called, no police assistance called, that Mother continued to walk with the child.
>
> They stopped to get food first before they presented for what the original reason was, which was to check on her breathing issues. So, that was my concern.

(*Id.* at 68-69). At the conclusion of her investigation, Ms. Bolger indicated the CPS report "[b]ased on medical evidence," as well as the fact that "Mother was unable to explain how the ingestion occurred." (*Id.* at 66, 67).

After considering this testimony, the court made the following findings at the conclusion of the hearing:

> Let me be clear. *Prima facie* evidence of abuse is a rebuttable presumption, and case law is clear that parents can provide testimony and evidence to rebut the presumption that they are, in fact, perpetrators of child

- 11 -

abuse.

No such testimony was provided today. No such explanation was given to DHS when the investigation was conducted by DHS on April 29 of 2022, or when Dr. Atkinson spoke to Mother on April 28 of 2022.

As such, Mom has not effectively rebutted the presumption that there is *prima facie* evidence that she was the perpetrator of child abuse as to [Child], albeit not knowingly or intentionally.

Let me be clear. The whole explanation of Mom walking around a bus, a car coming through the intersection, coming around the bus, knocking a stroller over, such that the child didn't fall out but her head hit the ground, somebody helping pick her up whose—contents of their purse may have fallen on the ground, and [Child] may have ingested an opiate that way is beyond my ability to comprehend.

Similar to what DHS testified, that the story made no sense to them, and Dr. Atkinson in her child abuse report indicated it didn't really make sense—so, even if I weren't finding child abuse as to Mother, at a very minimum, I would find dependency as to Mother, because for a 16-month-old to be in a stroller, if I take as truth—which I'm not—the story that a car hit [Child's] stroller, she was knocked over, hit her head … it would seem to me that every parent should note if a child hits their head, they must immediately go to the doctor or a hospital or something to be looked at for possible concussions.

Mom didn't have anybody call 911. She didn't call 911. And maybe she didn't have a phone, but she didn't … even [ask] anybody on the scene to call 911. Then, not only did she not call 911; she … stopped to get food instead of taking [Child] directly to the hospital to be looked at….

(*Id.* at 99-101).

Upon review, we conclude that the record supported the court's finding

that Child was a victim of abuse "of such a nature as would ordinarily not be

sustained or exist except by reason of the acts or omissions of" Mother. **See** 23 Pa.C.S.A. § 6381(d). Specifically, DHS demonstrated that Mother was responsible for Child at the time when Child ingested the fentanyl, and the resulting injuries were abusive in nature. **See Interest of A.S.**, 255 A.3d 1282 (Pa.Super. 2021) (unpublished memorandum) (explaining Section 6381(d) presumption applied to father where child suffered from cocaine and opiate poisoning while in mother and father's care, regardless of whether father was physically present when poisoning occurred).[8] After DHS presented its evidence, Mother offered no testimony or other evidence to rebut the presumption against her. **See Interest of G.R., supra** (holding that Superior Court was constrained to affirm trial court's finding that parents perpetrated abuse where trial court deemed DHS' witnesses credible, and parents did not testify or present rebuttal witnesses). Absent more, Mother is not entitled to relief on her first three issues. **See In re A.B., supra**.

In her fourth issue, Mother contends that the record does not support the court's decision to transfer custody to Father. Mother asserts that DHS's evidence "focused solely on a single incident which occurred approximately [nine] months prior to the hearing[.]" (Mother's Brief at 33). Mother insists that she provided a safe home for Child prior to the incident, and DHS received no other reports about Child while she was under Mother's care. Mother also

---

[8] **See** Pa.R.A.P. 126(b) (stating non-precedential decisions of Superior Court filed after May 1, 2019 may be cited for persuasive value).

- 13 -

emphasizes the CUA case manager's testimony that: 1) she did not have any concerns about Mother's ability to care for Child; 2) Mother had obtained safe and appropriate housing; 3) Mother demonstrated a close bond with Child during their visits; and 4) Mother provided for Child's needs and safety during the visits. To the extent the court criticized Mother for her conduct immediately prior to Child's hospitalization, Mother maintains that "there was no testimony that any delay in Mother presenting to the emergency room had any adverse impact on Child's health or welfare." (*Id.* at 34). Mother concludes that this Court must reverse the order that transferred custody. We disagree.

The Juvenile Act defines a dependent child, in pertinent part, as follows:

**§ 6302.  Definitions**

\*       \*       \*

**"Dependent child."**  A child who:

(1)   is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his [or her] physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302.

A court may adjudicate a child as dependent if the child meets the statutory definition of a dependent child by clear and convincing evidence.

*See In re E.B.*, 898 A.2d 1108, 1112 (Pa.Super. 2006).

> If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

> The definition of a dependent child contained in section 6302 clearly states that a child must lack a parent, guardian or other legal custodian who can provide appropriate care to the child. A child whose non-custodial parent is ready, willing and able to provide such care does not meet this definition.

> \* \* \*

> The plain language of the statutory definition of a dependent child compels the conclusion that a child is not dependent if the child has a parent who is willing and able to provide proper care to the child. When a court adjudges a child dependent, that court then possesses the authority to place the child in the custody of a relative or a public or private agency. Where a non-custodial parent is available and willing to provide care to the child, such power in the hands of the court is an unwarranted intrusion into the family. Only where a child is truly lacking a parent, guardian or legal custodian who can provide adequate care should we allow our courts to exercise such authority.

*In re M.L.*, 562 Pa. 646, 649-50, 757 A.2d 849, 850-51 (2000). "In other words, if a dependency petition is filed against the custodial parent and there is sufficient evidence for the court to adjudge the child dependent but for the intervention of the non-custodial parent who is willing and capable of caring for the child, the trial court may properly grant custody to the non-custodial

parent in a dependency proceeding." ***Interest of J.B.***, 247 A.3d 447, 453 (Pa.Super. 2021).

Instantly, DHS's witnesses testified about Child's injury, as well as Mother's explanation of the circumstances leading to Child's hospitalization. DHS also presented testimony from the CUA case manager, Quaemia Sanders, regarding Father's involvement with Child.  Mother's great-aunt presented Father to CUA and DHS.  A CUA worker met with Father, assessed his home, and deemed it safe and appropriate for Child.  Child moved into Father's home in October 2022, and Child is "well bonded with Father[.]"  (N.T. Hearing at 79).  CUA workers have visited Father's home on a weekly basis since Child's placement.  During this period, Father has kept Child up to date with her medical appointments, and Child is developmentally on target.

Based upon this testimony, the court made the following conclusions:

> [T]he court addressed a finding of Child Abuse under … the rebuttable presumption rule … indicating that Mother was the sole caregiver of the child when she suffered a **near fatality** and offered no testimony to successfully rebut the presumption that she was responsible for the injuries the child endured.  Moreover, Mother's changed storyline which varied slightly, was completely bizarre, making Mother non-credible and therefore unable to overcome the presumption. For the same reasons, Mother's parenting capacities gave such concern to the court that but-for Father's … status, the trial court would have found the child to be dependent as to Mother.  However, because the child had successfully lived in Father's care with supervision by the social work team for approximately four (4) months pursuant to a temporary custody order made by the trial court, nothing prevented Father from continuing to care for the child as a ready, willing and able parent….

(Trial Court Opinion, filed 3/30/23, at 1-2) (emphasis in original) (internal citations and come capitalization omitted).

Here, the court credited the evidence demonstrating Mother's questionable parenting decisions. The court also credited the testimony establishing that Father is willing and capable of caring for Child. In light of the competent record evidence, we decline Mother's invitation to disturb these credibility determinations. ***See In re A.H., supra***. Therefore, we cannot say that the court abused its discretion by placing Child in Father's custody under these circumstances. ***See Interest of J.B., supra***; ***In re A.B., supra***. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/3/2023